FILED & ENTERED

NOV 09 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Gonzalez DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | CHAPTER 7 |
| Oded Wolf | Case No.: 1:11-bk-22172-MT<br>Adv No: 1:12-ap-01016-MT |
| Debtor(s). | **FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL** |
| Yahalomey Paz Israel, G.P. dba/aka Paz Diamonds Israel, an Israeli general partnership | Dates: October 2-4, 2017<br>Time: 9:00 am<br>Courtroom: 302 |
| Plaintiff(s). | |
| v. | |
| Oded Wolf | |
| Defendant(s). | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Trial in the above-captioned adversary action took place October 2-4, 2017. Plaintiff

Yahalomey Paz Israel, G.P. dba/aka Paz Diamonds Israel, an Israel general partnership

("Plaintiff," "Paz Israel," or "Paz") was represented by Nico N. Tabibi, Esq. of the Law Offices of Nico N. Tabibi, APC and Defendant Oded Wolf, Debtor herein ("Defendant," "Debtor," or "Wolf"), was represented by Stella A. Havkin, Esq. of Havkin & Shrago.

The Court, having considered the Complaint, Answer, subsequent pleadings and discovery, Joint Pre-Trial Order, [Docket No. 117], the evidence and declarations admitted prior to and/or during trial, the live testimony and exhibits admitted at trial, those matters of which the Court took judicial notice, and the entire record, makes the following Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

1.    Plaintiff is a general partnership organized and existing under the laws of Israel. Plaintiff is a dealer involved in the consignment of fine diamond goods to various persons in the jewelry industry.

2.    Wolf Diamonds, Inc., a California corporation ("Corporation"), was an entity owned and controlled by Defendant at all relevant times. Defendant's brother, Amir Wolf ("Amir") was also a shareholder.

3.    During 2000 to 2004, when Plaintiff and Defendant transacted with one another, Defendant's primary if not exclusive source of income was the proceeds and assets of the Corporation.

4.    Defendant supervised Ma Kristilyn Mallari ("Ilyn"), who was in charge of keeping the Corporation's book and records. Defendant and Amir testified that in 2008, the Corporation was shut down entirely and ultimately was dissolved in 2009. Defendant and his brother Amir made all decisions at the Corporation. (JPS ¶15.)

5.    Defendant is an individual. On October 17, 2011, Defendant filed a voluntary petition in bankruptcy in this Court under Chapter 7 of the Bankruptcy Code ("Code"), Case No. 1:11-

bk-22172-MT. The order fixing the time for filing complaints to determine dischargeability of any debt and/or objection to discharge set the deadline of January 17, 2012, on or before which Plaintiff filed its Complaint.

6. Defendant filed a prior bankruptcy action relating to mostly the same debts as in this bankruptcy action. Defendant filed a Chapter 13 bankruptcy petition, case No. 1:09-bk-24346-MT, which was dismissed on October 20, 2010, due to Defendant's failure to make plan payments ("First Bankruptcy Case").

7. Defendant listed an unsecured, disputed debt to Plaintiff, based on Plaintiff's claims of a personal guarantee for diamonds consigned by Plaintiff to the Corporation, in the sum of $2,940,839.16 in this bankruptcy action. (Joint Pre-Trial Order, ¶8.)

8. On October 29, 2008, Plaintiff filed a lawsuit in Los Angeles Superior Court Case No. BC400951 ("State Court Action") against Defendant, Corporation, and Defendant's brother, Amir, seeking to recover for such diamonds in the sum of $2,940,839.16. Defendant filed an Answer on September 21, 2009. Although Plaintiff obtained a default judgment against Amir, Plaintiff was prevented from obtaining a judgment or litigating on the merits due to the repeated bankruptcy filings of Defendant.

<u>The Dealings between the Parties</u>

9. Between September 2000 and July 2004, the Corporation entered into a series of written agreements for the consignment of diamonds ("Memoranda of Consignment") from Plaintiff to Defendant and his Corporation. (See Joint Pre-Trial Order, ¶10.)

10. Pursuant to the Memoranda of Consignment, Plaintiff delivered diamonds on consignment to Defendant and his Corporation. Additionally, upon the terms stated therein, Defendant and his Corporation agreed to return all the diamonds described in the Memoranda

of Consignment, or alternatively to pay for the value of such diamonds, upon Plaintiff's

demand.

11.     Defendant dealt primarily with Ronit Fouzilev ("Ronit"), who is the daughter to the

founder of Paz Israel. Ronit made all arrangements with Defendant Wolf and represents her

elderly father in the business. She is involved in all aspects of Paz Israels' business, including

sales, marketing, and finances.  She is a distant relative of Wolf and resides in Israel.

12.     As of October 2004, Plaintiff delivered to Defendant and his Corporation diamonds

valued at $10,314,129.63 pursuant to Memoranda of Consignment. (Exhibit 1; Ronit Trial

Testimony.) Exhibit 1, together with Ronit's testimony at trial, accounted for the diamond

goods provided by Plaintiff to Defendant and the Corporation, including descriptions and

values of the goods at all relevant times. Defendant was listed as consignee on certain

Memoranda and/or invoices in Exhibit 1.

13.     Ronit testified at trial, and was corroborated by Ilyn in connection with Exhibit 1-115,

that Defendant purchased a total of $4,522,751.42 worth of diamonds from Plaintiff, but

made only $2,666,489.41 in payments prior to the October 2004 Agreement (as defined in

¶36). Prior to the October 2004 Agreement, Defendant delivered written documentation to

Plaintiff that the value of diamonds on hand with the Corporation was $1,127,857.72, with an

additional $561,053.83 in diamonds on hand that had been memoed. (Exhibit 14-16; Exhibit

1-115; Ilyn Trial Testimony).

14.     Defendant executed written Guaranty agreements ("Wolf Guaranties") for certain

Memoranda of Consignment. (Exhibit 15.) Pursuant to the Wolf Guaranties, Defendant

personally guaranteed all obligations imposed by the respective Memoranda of Consignment,

including but not limited to the financial obligations and performance obligations.

15.    No evidence was presented that the Wolf Guaranties were waived, nullified, rescinded, or

otherwise cancelled, and said guaranties are in full force and effect.

<u>Corporate Records</u>

16.    Plaintiff and Defendant stipulated to admission of all exhibits that are part of the record.

Additionally, Exhibits 6, 8, 12, 13, and 35 were deemed to have been produced by the

Defendant's accountant, Amnon Mahller, CPA. The internal records of the Corporation

produced by Defendant's accountant were partial, sporadic, and not for the entire duration of

time at issue in this present action.

17.    Ilyn testified that the Corporation's computers used the software system "Diamond

Software," which kept track of the Corporation's diamond purchases, sales, and inventory.

(Ilyn Trial Testimony; reading into the record Ilyn Deposition Transcript 12:7-15.)

18.    At all relevant times, while working at the Corporation, Ilyn was responsible for

managing accounts receivable and accounts payable and creating diamond inventory reports

using the Diamond Software. (Ilyn Trial Testimony, reading from Ilyn Dep. 12:7-15.)

19.    Based on Ilyn's testimony about the data recorded in the Diamond Software, the

Corporation's diamond inventory at any point in time (including all times relevant to this

litigation) could be determined by calculating the difference between the diamonds that were

received and sold by the Corporation. (Ilyn Trial Testimony.)

20.    Based on Ilyn's testimony about the Diamond Software, data recorded in such software

included records of the ID of each diamond, which evidences the consignor of the diamonds

that made up the Corporation's diamond inventory. (*Id.*)

21.    Based on Ilyn's testimony about the Diamond Software, the data recorded in such

software detailed whether payments for the diamonds had been made, but did not record the

method of payment, i.e. cash payments versus credit and check payment.

22.     Defendant testified that he kept "a cash book," which he destroyed about every two months when it was full, and eventually the last cash book at the time of the Corporation closed.

23.     The data recorded in the Diamond Software regarding the Corporation's inventory of consigned diamonds from Plaintiff, the valuation of such diamonds, the identification of such diamonds, and the records of diamonds bought and sold by the Corporation was true and accurate except that Plaintiff and Defendant would sometimes agree on a lower valuation for a specific diamond which would be documented in an email. Changes were made on the software, and a new identification number was possibly assigned to the diamond, although it was not clear if that always was done.

24.     Ilyn and Ronit both explained that the diamond inventory report dated October 26, 2004 ("October 2004 Inventory Report") was created by Ilyn based on the information and data stored in the Diamond Software on the Corporation's computer(s). (Exhibit 14.)

25.     The October 2004 Inventory Report was a true and accurate record of Plaintiff's diamonds that were consigned to the Corporation.

26.     Ilyn testified that the Corporation moved its books and records, including some of the Corporation's computers, during multiple changes of office location. The first move was from the Hill Street address to the City National Bank address, and the second move was to the Encino address. Ilyn further testified that the move from the City National Bank office to the Encino office took place after the Corporation closed sometime in 2008. It was, however, not clear from Ilyn's testimony what software was still on her computer and which computers were kept in the move.

27.     Although Ilyn testified that the Diamond Software preserved the records relating to inventory, assets, and receivables of Defendant's Corporation, Defendant testified he had no

knowledge of said records as of the Corporation's shut down date. The Court finds that

records existed as of the Corporation's shut down date.

28.     Defendant and Corporation's accountant provided to Plaintiff significant business records

of the Corporation.   (Exhibits D, E and F, Exhibits 6, 9, 10, 11, 12, 13, 14, 21, 34, 35.)

Plaintiff did not introduce any evidence of its attempts to seek the production of any other

documents of the Corporation or Defendant from third parties other than the Corporation's

accountant.

29.     Defendant testified and the testimony was not disputed that he had never provided

Plaintiff with his personal financials and he was ever asked for such financials.  Ronit did not

testify that she received any financials from Defendant.

Computer Records and Diamond Software

30.     With reference to the Corporation's computers and the Diamond Software on such

computers, Defendant was under this Court's order in his First Bankruptcy Action to appear

at a Rule 2004 examination and produce documents relating to Plaintiff's diamonds ("2004

Examination"), which examination took place on February 4, 2010. (Exhibit 22.) Defendant

was fully aware that the Corporation's computers had pertinent records and agreed to

produce such computers at Defendant's continued 2004 Examination, which Defendant

failed to do. At the time of the initial and continued 2004 Examinations, in 2010, Defendant

admitted that the Corporation's computers were in Defendant's possession. The testimony

concerning which computers were moved between business locations, which were moved to

Defendant's home, and which ones contained the diamond software was confusing and

vague. What computers remained with Defendant containing the diamond inventory was

never clarified.

31.     In trial, Defendant stated that he retained a computer expert to remove the hard drive from the computer that was going to be used at the new Encino office and install a new hard drive. (Exhibit 10; Defendant Trial Testimony.) Defendant made inconsistent representations as to the status of the various computers used in his businesses over the years both during trial and in previous testimony.  During discovery, Defendant testified that earlier computers used in the diamond business were "thrown out" at the time the Corporation closed in 2008. (Exhibit 22.) He later referred to some computers being stored in his garage.  Whether the computers stored in his garage in 2010 were one of the ones that should have contained the diamond software was not clear.

32.     Plaintiff initially requested the inspection of the computers on February 4, 2010. (Exhibit 22.)  Defendant testified and Plaintiff acknowledged that Plaintiff did not schedule the inspection but relied on Defendant's agreement to bring the computers to a continued examination.  The next time Plaintiff requested the inspection of the computers was on May 11, 2015 which was over five years after the initial request which was not completed by Plaintiff.  (Exhibit 20.)

33.     The lack of documentation concerning assets of the Corporation including disposition of such assets upon closing date do not affect the ability to determine the total value of Defendant's assets and income in 2004, but make it more cumbersome to track specific diamonds and sales. The lack of documentation is a result of Defendant's general approach to not maintaining records because they would enable someone to trace what he was doing with cash and diamonds.  It is also unlikely those records would have done much to assist in determining his financial condition in 2011 when the current bankruptcy was filed.  There were numerous business ventures and a recession in the 2004 to 2011 period.

34.    On October 22, 2004, Defendant represented his net worth to be around $2,880,000, as

set forth in Defendant's 2004 financial statement ("2004 Financial Statement"). (Exhibit 18-

3.)  There was no evidence that this 2004 Financial Statement was given to Plaintiff before

the October 2004 Agreement was to be signed, although it appears to have been prepared

about that time.

35.    Commencing on or about October 30, 2004, Plaintiff demanded return of its diamonds in

the possession, custody, and control of Defendant, or alternatively, payments for such

diamonds. (Exhibit 17, Ronit Trial Testimony.)

36.    On October 30, 2004, the Corporation entered into a hand-written agreement with

Plaintiff ("October 2004 Agreement"). (Exhibit 17.) Defendant was involved in negotiating

the October 2004 Agreement. Defendant made the decision to enter into the October 2004

Agreement with Plaintiff, and signed such agreement. (*Id.*)

37.    Pursuant to the October 2004 Agreement, upon the terms stated therein, the Corporation

agreed to immediately return all of Plaintiff's diamonds that were on consignment, or

alternatively pay for the value of such diamond goods by making minimum monthly

payments of $120,000, beginning in November of 2004. (Exhibit 17.) If such monthly

payments were not made to Plaintiff for three consecutive months, the entire balance would

fall due. (*Id.*)

## Witness Credibility

38.    The Court finds Ilyn's testimony to be credible as to the management and control of the

Corporation, the operation and/or business practices of the Corporation, the books and

records of the Corporation including but not limited to the record keeping with relations to

the diamond inventory as well as issuing and keeping invoices, memorandum of

consignment, and financial statements, with relations to such records kept in the

Corporation's files or on the Corporation's computers. Ilyn was not in a position to know what diamonds others took where they did not have her record such diamonds in the software.

39.    Ronit testified credibly about the way business was conducted between her father's company, Paz Israel, and Wolf Diamonds.  Her testimony was consistent with Ilyn's, but it generally was vague and lacked sufficient detail where it was not supported by actual documents. The statements she did make were truthful.

40.    Defendant Wolf testified extensively over two days.  He was defensive, difficult, and evasive.  The limited credible portions of his testimony were those supported by documents or other witnesses. The Court did not find Defendant to be credible, including but not limited to Defendant's testimony about:

    a.    Defendant's assets at all relevant times;

    b.    The Corporation's diamond inventory at all relevant times; and

    c.    Defendant's financial condition at all relevant times.

<u>Yossi Bitan</u>

41.    Both parties agree that an employee, Yossi Bitan ("Bitan"), converted some amount of the Corporation's diamond inventory that had been consigned by Plaintiff.  Plaintiff originally planned to pursue Bitan for that conversion, but this does not appear to have happened.

42.    Part of Wolf's defense was that Bitan took the missing diamonds.  Defendant explained that Bitan was Ronit's fiancé and was given free access to the Wolf Diamond safe.  Ilyn corroborated that Bitan had unrestricted access to the safe where diamonds were kept.  Wolf explained that Bitan would just take some diamonds to see if he could sell them and no memo would be prepared to track the diamonds. He did not state how often this occurred or

even place any estimate on the value of such diamonds removed in that fashion.  He stated that when Bitan removed a large number of diamonds at once, he did require an invoice to be prepared.  He referred to some exhibits that had been discussed at an earlier deposition. (Exhibit 21.)

43.     The agreement between Defendant and Plaintiff in October 2014 (Exhibit 17) and the initial lawsuit filed against Bitan by both Wolf and Paz Israel corroborated that Paz Israel believed that there were diamonds embezzled by Bitan.

44.     The evidence shows that even if Bitan took some of the diamonds, there was still a substantial sum unaccounted for by Wolf.  The Plaintiff proved by a preponderance of the evidence that Wolf either kept diamonds that he received from Paz or that he kept funds derived from the sale of the diamonds.  The evidence did not show exactly how much Wolf kept for himself, but even if Defendant is credited with all that was agreed as Bitan's theft in the 2004 Agreement (Exhibit 1-115), he failed to explain a significant sum.  Defendant identified a list of diamonds that were entrusted to Bitan. (Exhibit 21.)  He claimed there were others not on the list but never made an effort to identify them, despite having detailed inventory lists.

45.     Any diamonds allegedly converted by Bitan occurred sometime in 2003 and early 2004, at least a few months before: (a) Plaintiff and Defendant entered into the October 2004 Agreement; and (b) Ilyn's accounting written on a post-it note affixed to the October 2004 Inventory Report. It is unclear from the evidence which of the diamonds listed on the October 2004 Inventory Report were taken by Bitan. In any case, it is clear that he did not take all of the missing diamonds.

46.     Defendant, Amir, and Ilyn all testified that Bitan converted diamonds that belonged to Plaintiff as well as additional diamonds that belonged to the Corporation.  Defendant testified

that the Corporation filed a police report.  The Corporation and Plaintiff filed a lawsuit

against Bitan in 2004.  On March 24, 2009, the Corporation obtained a judgment for

$69,279.20 against Bitan.  (Exhibit B.)  Defendant testified that the Corporation only

obtained such a small judgment because the majority of the converted diamonds did not

belong to the Corporation but rather to the Plaintiff.  He further testified that since Plaintiff

was not licensed to conduct business in California, it could not pursue a claim against Bitan.

As such, Plaintiff was dismissed from the lawsuit.  Equally, the Corporation could not pursue

such claims against Bitan on behalf of Plaintiff.   Defendant further testified that Corporation

paid significant attorney's fees to obtain a judgment for which it was not reimbursed by

Plaintiff.

Overvaluation of Diamonds

47.    Wolf testified that at least a portion of the discrepancy between the value of diamonds

received from Paz and the amount returned to Paz could be explained by the practice of

renegotiating and reducing the cost of overvalued diamonds. Wolf's explanation was

confusing, included very little detail and was not convincing.  There were clearly diamonds

not accounted for when Paz and Wolf Diamonds entered into the agreement to cease their

arrangement. (Exhibit 1-115.)  If the diamonds that were left were worth less than what Paz

stated in the original invoices, Wolf never raised that issue as part of the resolution they

reached and never explained it clearly at trial.  Given that the shortfall was approximately

$1.7 million, it is also unlikely a difference in valuation would account for the discrepancy

between what the records showed was consigned and what was actually returned or paid for.

48.    If Paz overvalued the diamonds, the diamonds themselves could have been returned.

Carrying the original invoiced amount on the books would result in an unpaid amount only if

the diamond were sold and the funds not remitted to Paz for that diamond.  In addition, the

-12-

evidence indicated that written adjustments were made anytime Wolf and Paz disagreed on the value of a diamond.

49.     Even if Bitan took some of the diamonds, Wolf agreed to pay $120,000 per month until Paz Israel was made whole either by him or through recoveries from the other individuals Wolf said took diamonds. (Exhibit 17.) If he did not pay that amount for three months, the entire amount would be due.  Wolf must have believed he owed funds back to Paz as of October 30, 2004 when he signed this agreement.

50.     Wolf dismissed the validity of the October 2004 agreement by claiming that he could not understand any of the handwriting on it, and only after he saw the translation years later did he realize that they did not include terms they had verbally agreed to.  The agreement was handwritten in Hebrew, but the translator seems to have been able to understand most of the handwriting.  Wolf admits that Hebrew is his first language and that he speaks and understands it fluently.  He also pointed to just one term that he believes was agreed to and not included in the written agreement.  He testified that Paz agreed to continue sending him diamonds so that he could sell them to make a profit to use to pay them back the agreed monthly sum.

51.     Defendant did not explain why he agreed to return all unsold diamonds during that same visit from Paz if they were to continue to supply diamonds in order to enable him to pay the amounts owed under the agreement. Even if his testimony were to be believed that the term of continued diamond supply was left out of the written agreement, his own testimony supports plaintiff's position that he had taken diamonds consigned by Paz and not paid for them or returned them.

52.     At trial, Defendant could not account for or explain what happened to Plaintiff's remaining diamonds. Although Defendant signed the October 2004 Agreement, expressly

agreeing to return Plaintiff's diamonds or the proceeds therefrom, Defendant could not account for or explain the return or disposition of Plaintiff's diamonds testified to by Ilyn, specifically, the $1,127,857.72 diamonds on hand and $561,053.83 diamonds that had been memoed, despite being given an opportunity to do so at trial. (Exhibit 14-16; Defendant Trial Testimony.) At trial, Defendant testified only to having knowledge of the diamonds returned to Plaintiff by the Corporation in the sum of $722,326.53.

53.    At trial, Defendant admitted that Defendant owes Plaintiff at least $966,585.02. (Exhibit 1-115; Defendant Trial Testimony.)

54.    The diamonds that Defendant agreed to return to Plaintiff in the October 2004 Agreement were the property of Plaintiff.

55.    Defendant assumed the debt and liabilities of the Corporation.

56.    Defendant and Ilyn both testified credibly that there was a license to use the software that was needed to run the Diamond software program.

57.    Defendant testified and the testimony was not disputed that the Corporation's computer would not have provided Plaintiff with any further information because the Corporation did not continue to maintain an expensive license for the diamond software.  Defendant testified that the cost of maintaining the software would have been $1,500 per year from 2008 through the present.  Defendant testified and the testimony was not disputed that without such a software license, the computer, even if it was maintained, would have been useless in providing additional information.

<u>Loss Calculation</u>

58.    After the execution of the October 2004 Agreement, Defendant paid Plaintiff $85,000 and returned $722,326.53 worth of Plaintiff's diamonds, which left a balance due and owing by Defendant to Plaintiff of $2,767,811.03. (Exhibit 1-115.) Pursuant to the October 2004

Agreement, and Ronit's testimony at trial, the loss paid by Plaintiff on the account of a Steven Zales venture (unrelated to the issues at trial) was in the sum of $302,775.60, of which $181,665.36 was the responsibility of Defendant, for a total of $2,949,476.39. (Exhibit 1-115.)

59.    At trial, testimony of Ronit, which was corroborated by Ilyn, established that the "entire balance" as described in the October 2004 Agreement was $2,949,476.39. (Exhibit 17; Exhibit 1-115.) Specifically, Defendant testified that Exhibit 1-115 contained accurate information as to the amounts owed by Defendant's Corporation and Defendant as guarantor to Plaintiff. (Exhibit 1-115; Ronit Trial Testimony; Ilyn Trial Testimony.)

60.    Plaintiff relied almost exclusively on the inventory analysis completed by Ilyn and Ronit in October 2004 (Exhibit 1-115) and the agreement between the parties ending their business arrangement on October 30, 2004 (Exhibit 17).

61.    Both of these documents along with the testimony evidence an agreement that, although Wolf did not remit either diamonds or funds totaling $2,767,811.03, there were at least losses totaling $983,540.28 that were attributable to other people such as Ishai Raphael, Raphael Raz, Yosi Bitan and Steven Zales.

62.    The accounting shows that a total of $906,596.91 of the loss was agreed to as taken by other people.  As of that date, an additional $76,943.37 was paid in legal fees by Wolf to try to recover the loss from Bitan. The parties contemplated that there would be an arbitration or further litigation to determine the responsibility for the losses caused by others. It does not appear that this happened.

63.    A fair reading of the evidence is that $1,784,270.75 in losses were proven that can be attributed to Defendant. Although the loss to Plaintiff was higher, there was no evidence that Defendant should be held responsible for the entire loss.

2007 Financial Statements

64.    In or about June 2007, Defendant executed a financial statement for First Regional Bank ("2007 Financial Statement") wherein Defendant represented that he was the owner of the following assets: $2,300,000 in loose diamonds, $220,000 in jewelry, and $490,000 in account receivables. (Exhibit 16; Oded Trial Testimony.)

65.    Defendant also executed an Addendum to the 2007 First Regional Financial Statement wherein he represented that he owned one hundred percent interest in the parcel of real property 4301 Coronet Drive, Encino, California and fifty percent interest in the parcel of real property 11521 Moorpark Street, Studio City, California.

66.    Defendant testified that he signed the 2007 Financial Statement and Addendum thereto.

67.    Defendant testified at trial that he had made false representations on his 2007 Financial Statement and addendum thereto.

68.    The Court cannot determine whether the assets outlined by Defendant in his 2007 Financial Statement and Addendum thereto are an accurate description of Defendant's assets at the time because of the great variety of false sworn statements made by Defendant. Defendant's failure to explain the disposition of such assets along with the lack of any coherent accounting for the remainder of the Paz Israel consigned diamonds leads the court to conclude that Defendant kept at least some of the Paz Israel diamonds or funds derived therefrom.

69.    The failure to maintain careful records or to coherently explain the extensive records that Defendant did have, combined with Defendant's admitted regular destruction of all cash ledgers, support the conclusion that Defendant did not want anyone to be able to carefully trace exactly what money or property he took.

70.    The Corporation was "shut down entirely" in 2008. (Joint Pre-Trial Order, ¶12.)

2008 Balance Sheet

71.    The action entitled *First Regional Bank, a California State Bank v. Oded Wolf* was filed

in the Los Angeles Superior Court, case number BC404803. ("First Regional Action".)

(Exhibit 36.) A judgment was entered against Defendant in the First Regional Action, as well

as the related adversary action that First Regional filed in Defendant's First Bankruptcy Case,

Adversary Case No. 1:10-AP-01028-MT.

72.    Defendant submitted a balance sheet dated September 30, 2008 ("September 2008

Balance Sheet"), in support of his application for a loan from First Regional Bank. (Exhibit

36.) Defendant could neither confirm nor deny the September 2008 Balance Sheet or his

financial condition as of September 30, 2008. Despite Plaintiff's assertions, it is unlikely that

the September 2008 Balance Sheet is an accurate representation of Defendant's assets as of

September 30, 2008, specifically, a net equity of $3,638,650 (Exhibit 36-19), but it does

appear likely that Defendant had additional assets to enter into some new business following

the closing of the diamond business.

Real Property and LLCs

73.    Following the demise of his diamond business, Wolf endeavored to get involved in real

estate investments.  A key piece of that plan was obtaining a loan from First Republic Bank

based on what Wolf admitted at trial was a false financial statement.

74.    On July 6, 2007, Wolf caused Ilyn to send an email to First Republic listing 11 properties

as his "projects."  The list included properties at 11521 Moorpark and 16806 Addison.

(Exhibit 36-18.)  On July 16, 2007, Wolf represented to First Republic that he owned

properties on Coronet, Addison and Moorpark. (Exhibit 36-15.)  He distanced himself from

the ownership of the properties during his testimony, explaining how they were really owned

by others, but stated that "he would have agreed to anything in 2007" in order to get the loan to allow him to move into the real estate market.

75.    The evidence of what interest Defendant actually owned in these properties was confusing so that the court cannot determine whether Wolf ever had an interest in the actual properties or just an interest in an LLC owning the properties.  The evidence showed that Defendant had some interests in various LLCs involved in real estate investments, and it appears all properties in which Defendant had some interest were sold before the current bankruptcy was filed in October 2011. The exact names and membership of the LLCs was never explained by either party.

76.    The Moorpark Property or the LLC holding it and possibly others appeared to have generated some income, although how much and owing to whom was never clarified.  The Seller's Final Settlement Statement showed Wolf as the Seller of the Moorpark property, which sold on August 26, 2011.  Wolf claimed the property was only in his name for purpose of getting the loan, and it was transferred to another entity.  He claimed to have made nothing from it. There was no value to either the Moorpark or Addison property shown by the time the bankruptcy was filed.

77.    When Defendant filed bankruptcy in October 2011, he listed no real property. He also listed no interest in the Demar Group or Tower Group or any LLC investing in real estate.

78.    On February 6, 2012, Wolf signed a settlement agreement with the Demar Group, the Tower Group, and 11521 Moorpark LLC, among others, to resolve all claims related to the 11521 Moorpark LLC project.  That agreement, states that Wolf had already received $10,000 as an initial payment for a $90,000 settlement to be paid in installments over the next year. (Exhibit 32-1.) Wolf testified that there had been discussions and business dealings

before the settlement was signed, but the transactions happened years before then. He claimed to have received nothing for the investment.

79.    Defendant amended his Schedule A on March 2, 2015 to state that the Moorpark property was short sold in April 2012, that the Addison property was sold in 2007, and that Coronet property is the sole and separate property of his wife and he has a minimal $100 community property interest in it.  (Exhibit 27-47.) He did not amend Schedule B at that time or disclose any joint venture or other property interests.

80.    On March 6, 2015, Wolf caused a lawsuit to be filed against Arie Abekasis, Raquel Ohnona, the Demar Group, and others asserting a breach of contract with respect to LLC property investments in which Wolf alleged he had an interest. Defendant gave a vague and confusing explanation of how a business associate of his needed him to file the lawsuit in his name but how he really didn't know anything about it, and it was dismissed anyway. (Exhibit 33-7.)

81.    On July 31, 2015, he amended Schedule B to disclose a "claim for sweat equity interest in a joint venture against Serge M. Benat, Joe G. Garcia, and Raquel Ohnon for moneys believed to be owed. The amount is uncertain as the parties refuse to provide accounting but believe to be $90,000. The partners have been uncooperative and unlikely to voluntarily pay up." (Exhibit 27-55.)  Defendant also argued in closing that anything he might receive from the group would be exempted under the wildcard exemption anyway.

82.    Defendant's testimony, combined with his previous statements concerning the home he lived in when he filed bankruptcy, 4301 Coronet in Encino, was inconsistent.  Plaintiff's proofs on this property were inconclusive. It appears Defendant had some undetermined community property interest, but it was not shown to be material.  Wolf has represented that he owned it when it suited him for obtaining a loan. (Exhibit 36-15.)  No value to the estate

at the time of filing was shown in any case, even if there was a false statement in the original

schedules.

## CONCLUSIONS OF LAW

1.     This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 over the subject matter of

this proceeding because the claims asserted herein related to a case pending under the

Bankruptcy Code for the Central District of California, San Fernando Division (the

"Bankruptcy Court"). This is a core proceeding under 28 U.S.C. §157(b). Pursuant to 28

U.S.C. §§ 1408 and 1409, venue is proper in the Central District of California, San Fernando

Division.

## DENIAL OF DISCHARGE UNDER § 523(a)

2.     The provisions of the § 523(a) exceptions to discharge should be construed narrowly.

See, e.g., Cal. Franchise Tax Bd. v. Jackson (In re Jackson), 184 F.3d 1046, 1051 (9th

Cir.1999); Bowen v. Francks (In re Bowen), 102 B.R. 752, 756 (B.A.P. 9th Cir. 2001).

3.   Exceptions to dischargeability under §523(a) must be proven by the creditor by a

preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991).

### 11 U.S.C. § 523(a)(2)(A)

4.     11 U.S.C. § 523(a)(2)(A) excepts from discharge any debt "to the extent obtained by

false pretenses, a false representation, or actual fraud, other than a statement respecting the

debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).  A creditor's claim of

nondischargeability based on § 523(a)(2)(A) must satisfy five elements: (1) the debtor made

false statement or deceptive conduct; (2) the debtor knew the representation to be false; (3)

the debtor made the representation with the intent to deceive the creditor; (4) the creditor

justifiably relied on the representation; and (5) the creditor sustained damage resulting from

its reliance on the debtor's representation.  In re Slyman, 234 F.3d 1081, 1085 (9th Cir. 2000).

5.      The false statement alleged here appears to be a generalized statement before the Paz Israel shipments started that Defendant had substantial assets, including real estate holdings, inventory, accounts receivable, cash, and multiple business ventures, and that he could satisfy any indebtedness that occurred.

6.      The only testimony at trial concerning representations made before Plaintiff shipped diamonds to defendant was from Ronit Fouzailov that she had the impression that Wolf Diamonds had inventory of its own and many respectable customers.  No detail beyond that was provided, and it was never made clear where Ms. Fouzailov got that impression. In addition, if these were representations by Defendant, these specific representations were not shown to be false at the time they were made. There was no evidence that Defendant made representations about his real estate holdings, inventory, accounts receivable, cash, and multiple business ventures before the diamond shipping commenced, or even before the relationship fell apart. While Defendant was shown to be dishonest about other things, these misrepresentations were not proven.

7.      Plaintiff argues that the diamond business is built on trust and good faith between individuals, and Defendant violated that trust.  While that is true, §523(a)(2)(A) requires a specific misrepresentation that the plaintiff relied on in extending credit or shipping goods. As that was not shown, no violation of 523(a(2)(A) is found.

11 U.S.C. §523(a)(2)(B)

8.      As §523(a)(2)(B) requires the use of a statement "in writing," and no writing of any sort was introduced on which Defendant relied, the court ruled at the end of trial that no violation of §523(a)(2)(B) would be found.

-21-

<u>11 U.S.C. §523(a)(4)</u>

9.      Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting

in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The phrase

"while acting in a fiduciary capacity" in § 523(a)(4) does not qualify the terms

"embezzlement" or "larceny." <u>In re Littleton</u>, 942 F.2d 551, 555 (9th Cir. 1991).

10.     A larceny claim under § 523(a)(4) excepts from discharge any debt where a debtor took

the property of another with intent to convert such property to the taker's use without the

consent of the owner. <u>Lucero v. Montes</u>, 177 B.R. 325, 331 (Bankr. C.D. Cal. 1994).

11.     Embezzlement is defined as "the fraudulent appropriation of property by a person to whom

such property has been [e]ntrusted or into whose hands it has lawfully come." <u>In re Wada</u>,

210 B.R. 572, 576 (B.A.P. 9th Cir. 1997).

12.     As Defendant was in lawful possession of the diamonds at the time they were taken,

Defendant's acts sound in embezzlement, not larceny.

13.     Federal law, not state law, controls the definition of embezzlement for purposes of

section 523(a)(4). <u>Id</u>. Under federal law, embezzlement in the context of nondischargeability

requires three elements: "(1) property rightfully in the possession of a nonowner; (2)

nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3)

circumstances indicating fraud." <u>Id.</u>; <u>In re Littleton</u>, 942 F.2d at 555.

14.     The diamonds Paz sent came into Defendant's possession lawfully as agent for Wolf

Diamonds. The first element of embezzlement is satisfied.

15.     The diamonds were all consigned for the purpose of selling them and remitting part of the

proceeds to Paz. The evidence showed that Paz sent diamonds valued at approximately $4.5

million to Wolf Diamonds. (Exhibit 1-115.) Only $2.7 million was remitted, and $722,326

worth of diamonds was actually returned. Wolf's explanation for the unaccounted-for

diamonds or proceeds never explained the entire amount, leaving no conclusion other than

that some were taken for Wolf's own personal gain. This satisfies the second element of

embezzlement.

16.     The third element of embezzlement requires "circumstances indicating fraud." However,

it appears to be unsettled whether fraudulent intent is required for this section.  The Ninth

Circuit has made "no determination concerning whether federal law requires a finding of

fraudulent intent for larceny…."  In re Ormsby, 591 F.3d 1199, 1205-06 (9th Cir. 2010), and

that, if it is required, "[i]ntent may properly be inferred from the totality of the circumstances

and the conduct of the person accused." Kaye v. Rose (In re Rose), 934 F.2d 901, 904 (7th

Cir.1991). Id.

17.     If intent is required, the evidence here easily supports Defendant's fraudulent intent. As

detailed earlier, the Defendant admitted not paying for all of the diamonds he received and

tried to blame others or valuation issues.  The circumstances surrounding how Wolf managed

the books and records of his business suggest that he did not want the business dealings to be

easily traced. In particular, the regular destruction of the cash books and the inability to

account for individual missing stones despite each stone being accompanied by a memo

suggests a willful disregard for sound bookkeeping that could only inure to Defendant's

benefit.  Defendant's ever-changing narrative regarding the reasons for missing diamonds

and his conduct in replacing the hard drive of a computer after learning that Paz was seeking

access to the data it contained also show that he fraudulently and willfully took Plaintiff's

diamonds for himself. The third element of embezzlement is satisfied.

18.     Defendant makes the argument that the embezzlement claim must fail because the

property was entrusted to Wolf Diamonds, not to Oded Wolf personally. Presumably, this

implies that any embezzlement that occurred was carried out by Wolf Diamonds, a fictional

-23-

legal entity. Clearly, only individuals can carry out the acts necessary to embezzle property. It would obfuscate the purpose of limited liability to pin the onus of embezzlement upon a dissolved corporate entity. In running Wolf Diamonds, the diamonds were entrusted to the care of Defendant.

19.    Debtor's debt to Plaintiff is nondischargeable under 11 U.S.C. § 523(a)(4) because debtor's acts as described above constitute embezzlement.

11 U.S.C. § 523(a)(6)

20. Section 523(a)(6) excepts from discharge any debt of the debtor "for willful or malicious injury to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  Under § 523(a)(6), Debtors' actions would need to equate with "willful and malicious" injury within the meaning of the Code.  The first step of this inquiry is whether there is "willful" injury, which must entail a deliberate or intentional injury.  Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998).  In the Ninth Circuit, the intent required to be considered "willful" is either the subjective intent of the actor to cause harm or the subjective knowledge of the actor that harm is substantially certain to occur.  Carrillo v. Su (In re Su), 290 F.3d 1140, 1144-45 (9th Cir. 2002). A debtor is charged with knowledge of the natural consequences of their actions. In re Ormsby, 591 F.3d at 1206.

21. The second step of the inquiry is whether Debtors' conduct was "malicious."  The relevant test for such "malicious" conduct is: 1) a wrongful act; 2) done intentionally; 3) which necessarily causes injury; and 4) without just cause and excuse.  Jett v. Sicroff (In re Sicroff), 401 F.3d 1101, 1105-1106 (9th Cir. 2005).

22. The statutory scheme set out in § 523(a) indicates that nondischargeability claims alleging fraud should be brought under § 523(a)(2)(A). See McCrary v. Barrack (In re Barrack), 201B.R. 985, 990-91 (Bankr.S.D.Cal.1996) (finding that the more specific statute, §

-24-

523(a)(2)(A), controls fraud nondischargeability rather than the more general statute, §

523(a)(6)), *reversed on other grounds*, 217 B.R. 598 (B.A.P. 9th Cir. 1998). Indeed, section

523(a)(2)(A) expressly applies to debts "for money" obtained by "actual fraud." 11 U.S.C. §

523(a)(2)(A).

23. The Supreme Court has suggested that nondischargeability claims based on fraud fall within

the ambit of § 523(a)(6) only if: (1) the debtor fraudulently obtained something other than

money, property, or services; or (2) the fraud claim involved punitive damages. Grogan v.

Garner, 498 U.S. 279, 282 n. 2 (1991). The Supreme Court has since clarified that all

damages (both actual and punitive) resulting from a debtor's fraud are nondischargeable

under § 523(a)(2)(A). See Cohen v. De La Cruz, 523 U.S. 213 (1998).

24. This reasoning of §523(a)(2) has not been extended to §523(a)(4).  Although embezzlement

does fit squarely within another subsection of 523, the harm done squarely fits within

§523(a)(6)'s definitions as well. *See* In re Gunstream, 2011 WL 6301183, at *16 (Bankr. D.

Idaho Dec. 16, 2011) (Finding a debt nondischargeable for embezzlement under 523(a)(4) as

well as for willful and malicious injury under 523(a)(6)); Cornell v. U.S. Energy Corp. (In re

Cornell), 2006 WL 6810931 (B.A.P. 9th Cir. Feb 23, 2006) (Affirming the bankruptcy court's

judgment for 523(a)(4) nondischargeable fiduciary defalcation, but declining to review the

bankruptcy court's findings of embezzlement under 523(a)(4) and willful and malicious

conduct under 523(a)(6)). The Supreme Court has recently stated that some overlap between

the provisions of 523(a) appears inevitable. Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581,

1588 (2016).

25. Debtor's debt to Plaintiff is also nondischargeable under 11 U.S.C. § 523(a)(6) because

Debtor's acts described above demonstrate willful and malicious injury by the Debtor to Paz

Israel.

-25-

**DENIAL OF DISCHARGE UNDER § 727(a)**

26. In general, the bankruptcy court must grant a discharge to an individual chapter 7 debtor

unless one of the twelve enumerated grounds in § 727(a) is satisfied. In the spirit of the

"fresh start" principles that the Bankruptcy Code embodies, claims for denial of discharge are

liberally construed in favor of the debtor and against the objector to discharge. <u>Khalil v.

Developers Sur. & Indem. Co.</u> (<u>In re Khalil</u>), 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007) aff'd,

578 F.3d 1167 (9th Cir. 2009). The objector to discharge, thus, bears the burden to prove by a

preponderance of the evidence that the debtor's discharge should be denied under an

enumerated ground of § 727(a). Id.

27. The "knowing and fraudulent" intent standard of § 727(a)(4) means that Debtor must have

actual (not constructive) intent in concealing records or making an omission in schedules.  <u>In

re Wills</u>, 243 B.R. 58, 64 (9th Cir. B.A.P. 1999).  Fraudulent intent may be proved by

circumstantial evidence, and reckless disregard combined with other circumstances may

support an inference of fraudulent intent. <u>Matter of Sholdra</u>, 249 F.3d 380, 382 (5th Cir.

2001); <u>In re Khalil</u>, 379 B.R. 163, 174 (9th Cir. BAP 2007); <u>Retz</u>, 606 F.3d at 1199; <u>Stamat

v. Neary</u>, 635 F.3d 974, 982 (7th Cir. 2011) (reckless disregard shown where debtors who

failed to disclose business interests were highly educated and had significant business

experience). Intent can be established by consideration of the totality of circumstances. <u>In re

Devers</u>, 759 F.2d 751, 753–54 (9th Cir. 1985). The necessary intent under § 727(a)(2) "may

be established by circumstantial evidence, or by inferences drawn from a course of conduct."

<u>In re Adeeb</u>, 787 F.2d 1339, 1343 (9th Cir.1986) (quoting <u>Devers</u>, 759 F.2d at 753–54)).

28. Sections 727(a)(3) and (5) do not have an intent or state of mind requirement.  Denial of

discharge under these provisions only requires the debtor to act knowingly. <u>In re Scott</u>, 172

F.3d 959, 969 (7th Cir. 1999); <u>In re Cox</u>, 904 F.2d 1399, 1401 (9th Cir. 1990) (quoting

Burchett v. Myers, 202 F.2d 920, 926 (9th Cir.1953)).  A debtor acts knowingly if he or she acts deliberately and consciously. Retz v. Samson (In re Retz), 606 F.3d 1189, 1193 (9th Cir. 2010).

§ 727(a)(2(A) – Concealment or Destruction of Property of the Estate

29. Section 727(a)(2)(A) states that:

The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition.

30. Discharge of debts may be denied under section 727(a)(2)(A) only upon a finding of actual intent to hinder, delay, or defraud creditors.  In re Adeeb, 787 F.2d 1339, 1342 (9th Cir. 1986).  Constructive fraudulent intent cannot be the basis for denial of a discharge. Id. at 1343, quoting In re Devers, 759 F.2d 751 (9th Cir. 1985). However, intent "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." Id.

31. The allegations under this subsection are that Wolf failed to disclose numerous pieces of real property and interests in various LLCs. Plaintiff also alleges that diamonds were concealed.

32. Defendant responded to these allegations by pointing to how inconsequential these interests were and by the fact that he amended his schedules.  Failing to rectify inconsistencies and omissions when filing amended schedules may be weighed in favor of finding the requisite intent to deceive.  AutoSource Capital, Inc. v. Traina (In re Traina), 501 B.R. 379, 382 (Bankr. N.D. Cal. 2013).

33. Where the amended filings "were done at the debtor's leisure," such tardy amendment falls "well short of the requisite disclosure." See In re Arcuri, 116 B.R. 873, 882 (Bankr.S.D.N.Y. 1990), *abrogated on other grounds by* In re Wolfson, 139 B.R. 279 (Bankr.S.D.N.Y. 1992).

34. It is not clear whether Plaintiff is alleging that there were any diamonds still in debtor's possession at the time the bankruptcy was filed in 2011.  In any case, there was insufficient evidence that Wolf still had any at that point.  There was evidence that he had lost whatever he had left from the diamond business in real estate investments that failed in the recession from 2009 – 2011.

35. Section 727(a)(2)(A) requires the plaintiff to show that debtor has transferred or concealed property within one year of the bankruptcy filing.  Plaintiff's theory on this cause of action was confusing.  To the extent it relies on the Moorpark property, this property short sold six months before the bankruptcy filing and the schedules were amended timely when this was brought to debtor's attention. The fraudulent intent is not shown with this property because it was worth so much less than the loan on it at the time of filing.  Its omission is simply one more indicator, however, that debtor did not seek to really disclose carefully in his bankruptcy filing and was not diligent in seeking to provide a clear picture of his total financial situation.

36. Plaintiff has alleged concealment of assets or failure to explain loss of assets.  There is no allegation of a false oath under §727(a)(4)(A).  While Defendant seems to be unconcerned with the truth of what he says under oath, the court must look at the elements of the cause of action alleged.

37. Debtor's interest in the Demar Group limited partnership is a closer call as to whether there was an undisclosed asset of the estate.  In November 2011, Defendant filed this bankruptcy case. In February 2012, Wolf executed the settlement agreement with the Demar group.  The

settlement agreement states that he was to receive $90,000 and that he <u>already</u> received

$10,000 the day he signed the agreement.  This agreement was brought to his attention

during his deposition in 2015.  On March 2, 2015, he amended his schedules to list the

various properties such as Addison, Moorpark, and his wife's Coronet properties, and

explained they were all already sold without profit or were not his.  It was not until July 31,

2015 that he amended his schedules to list anything possibly related to Demar group.  He

listed only "sweat equity with Ohnona" and stated he was to receive $90,000 but was

unlikely to get it, so he took an exemption for $25,000.

38. Debtor was clearly aware of and negotiating with someone in the Demar group at the time he

filed bankruptcy.  At the time, it appears that he thought his investment was worth

something.  He completely failed to disclose anything about it.  Although the settlement

agreement states that he received $10,000, Plaintiff failed to point that out or impeach

Defendant when he said he received nothing.  No bank records or other evidence were even

provided showing there was actually any property of the estate that was taken or concealed.

Of all the assets that were vaguely referred to or argued as possible assets of the estate, none

were traced or shown to actually be present in the two years before or after filing.  Defendant

seemed to still be trying to collect what he could from failed LLC's, but the evidence did not

show that he accomplished it.

39. Plaintiff has failed to prove that Defendant should be denied his discharge under 11

U.S.C.§727(a)(2)(A) because the value of what property he had was not shown and there was

no showing he had such value in the year before he filed bankruptcy. Claims under

§727(a)(2)(A) are limited to events taking place within one year of the filing of the petition.

The Plaintiff had the burden of proof. While there was a lot of smoke, it never cleared to

reveal the fire.

## § 727(a)(3) - Failure to Keep or Preserve Records

40. Section 727(a)(3) provides for denial of a debtor's discharge if the debtor "has concealed,

mutilated, falsified, or failed to keep or preserve any recorded information, including books,

documents, records, and papers, from which the debtor's financial condition or business

transactions might be ascertained, unless such act or failure was justified under all of the

circumstances of the case." 11 U.S.C. § 727(a)(3).

41. To establish a prima facie case, the plaintiff must show that the Debtor (1) failed to maintain

and preserve adequate records; and that (2) such failure makes it impossible to ascertain their

financial condition and material business transactions. In re Cox, 41 F.3d 1294, 1296 (9th

Cir.1994).  Once the plaintiff establishes a prima facie violation of § 727(a), the burden shifts

to the Debtors to show that their lack of records was justified under the circumstances and to

provide a satisfactory explanation for their dissipation of the assets. In re Caneva, 550 F.3d,

755 (9th Cir.2008).

42. The [debtor] must present sufficient written evidence which will enable his creditors

reasonably to ascertain his present financial condition and to follow his business transactions

for a reasonable period in the past. In re Cox, 904 F.2d at 1400. In some cases, a failure to

produce proper records will not justify a denial of discharge when the missing information

can be reconstructed from records kept by others. See 6 Collier on Bankruptcy, ¶ 727.03

(Alan N. Resnick & Henry J. Sommer eds., 16th ed).  See In re Caneva, 550 F.3d at 761

(holding that when a debtor owns and controls numerous business entities and engages in

substantial financial transactions, the complete absence of recorded information related to

those entities and transactions establishes a prima facie violation of § 727(a)(3)).

43. After showing inadequate or nonexistent records, "the burden of proof then shifts to the

debtor to justify the inadequacy or nonexistence of the records." In re Cox, 41 F.3d at 1296

(citations omitted). To determine whether the failure was justified under the circumstances, the court should consider, among other factors it deems relevant, (1) [Debtor]'s intelligence and educational background; (2) experience in business matters; (3) the extent of involvement in the businesses for which discharge is sought; (4) [Debtor's] reliance [including her knowledge of whether records were being kept]; (5) the nature of the marital relationship; and (6) any recordkeeping or inquiry duties imposed upon [Debtor] by state law. In re Cox, 904 F.2d at 1403, n.5.

44. Plaintiff alleges that the diamond tracking software used by Wolf Diamonds was not preserved and has made it impossible to trace what happened to specific diamonds.  While Plaintiff has shown a failure to maintain the records immediately following the closure of the business and a willing lack of transparency during the earlier litigation, it has not shown that the records should have been maintained until 2011.

45. There was a lot of testimony concerning Defendant's failure to keep the computer records containing the Diamond Software.  Defendant made inconsistent and conflicting statements about the records. He first stated in 2010 that he had them in his garage and would bring them to a continued 2004 exam (which he failed to do), and then stated through his attorney in this bankruptcy case in 2015 that they were thrown out when the business was closed in 2008.  He then stated at trial that he had someone come in and take out the hard drives and put new ones in when he started his new business in 2008 in order to get a fresh start and get totally out of the diamond business. Later in the trial, he agreed with his statement provided by his attorney in 2015 that the computers were just thrown out when he closed the diamond business.

46. While Defendant did not go out of his way to preserve the records, or to turn them over to Plaintiff when required to do so, in the end his statements about the computers demonstrate

more of an effort to simply not cooperate in any way with Plaintiff rather than a failure to keep records "from which the debtor's financial condition or business transactions might be ascertained." This is because the printed records that were produced provide great detail about what diamonds Wolf received and what was paid for or returned. The printouts taken from the Diamond Software before it was cancelled actually show the Corporation's financial condition and business transactions.

47. Exhibit 1 lists all inventory received from Paz from 2001 through 2004 and attaches most memos and invoices for the diamonds going in and out of the inventory. It lists what was sent, what was paid for, the relevant dates, and the totals in each category. It encompasses the entire business relationship between the parties. Exhibit 9 provides item-by-item sales details with the client the diamond was sold to and the cost and selling price between May 2002 to November 2003. Exhibit 10 details each shipment of diamonds back to Paz Israel from October 27, 2004 through May 3, 2005 that total the $722,326.53 credit that Paz did give Wolf.

48. Exhibit 14-1 is a lengthy inventory report from October 26, 2004 which includes the total carats, measurements and other details of each diamond that was on hand. Exhibit 14-16 shows that Ilyn and Ronit were able to use this report to come up with the total value of diamonds on hand and the total out on memo. Exhibit 15 is another set of payments for diamonds to Paz between 2002 and 2003, although there was little testimony explaining this document.

49. Defendant's Exhibit E was admitted into evidence without objection but never fully explained. It appears to detail the inventory that was sent back to Paz Israel in five lists, with detailed breakdowns of each diamond, along with the shipping memos that appear to coordinate with many of Exhibit 10 Brink's shipments testified to by Ilyn and Ronit.

50. These documents demonstrate how much Wolf received and what he sent back, and there was an accounting and a listing of exactly what was still owed.  In addition, Wolf testified about Exhibit 21 as being the diamonds Bitan took and never paid for.  If the parties had wanted to trace each individual diamond and actually narrow the scope to specific diamonds or shipments, they could have done so to a great extent through these documents.  No one ever explained why that was not done or could not be done.  In any case, such tracing was not necessary to ascertain Defendant's financial condition – which specific diamonds were not accounted for was not necessary to know that not all were returned.  It appears that a further arbitration or other proceeding was going to take place to resolve Wolf's claim that others took some of the diamonds, but that never happened for reasons that were unexplained.  In any case, Wolf stipulated to the total amounts taken based on these inventory and sales lists.

51. While a computer program might have made the tracing easier, the capacities of the software were never explained, so the absence of the computer record is an insufficient basis for a finding under 727(a)(3).

52. Lastly, while Wolf was generally not credible, not maintaining an old computer or paying for unnecessary software from 2008 through 2011 for a failed business is justified under the circumstances where the paper records were already available.

53. Plaintiff has failed to prove a violation of §727(c)(3).

### Section 727(a)(4)(C)- Bribery

54. To sustain an objection under § 727(a)(4)(C), the objecting party must establish:

(1) knowledge and a fraudulent intent on the part of the debtor; and

(2) receipt of, or an attempt to obtain, or the giving or offering of, money, property or advantage, or a promise of these, for a purpose, namely, action or forbearance in the case

in which the offender is a debtor.

6 Collier on Bankruptcy ¶ 727.06 (16th ed. 2010); <u>Stokes v. Stokes</u> (<u>In re Stokes</u>), 451 B.R. 44, 87 (Bankr. D. Mont. 2011)(internal citations omitted).This subsection does not apply, even remotely, to any of the facts or theories advanced in this trial.  There were no allegations of any bribery or extortion or anything similar.

55. Plaintiff has failed to prove a violation of 11 U.S.C. § 727(a)(4)(C).

§ 727(a)(5) - Explaining Loss of Assets

56. Under 11 U.S.C §727(a)(5), a debtor may not be granted a discharge if the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities. Section 727(a)(5) is broadly drawn and gives the bankruptcy court power to decline to grant a discharge in bankruptcy when the debtor does not adequately explain a shortage, loss, or disappearance of assets. <u>Aoki v. Atto Corp. (In re Aoki)</u>, 323 B.R. 803, 817 (B.A.P. 1st Cir. 2005). Vague, indefinite, and uncorroborated explanations are unsatisfactory. <u>Bell v. Stuerke (In re Stuerke)</u>, 61 B.R. 623, 626 (B.A.P. 9th Cir. 1986); <u>Aoki</u>, 323 B.R. at 817.

57. Under § 727(a)(5), an objecting party bears the initial burden of proof and must demonstrate: (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets. <u>Retz v. Samson (In re Retz)</u>, 606 F.3d 1189, 1193 (9th Cir. 2010). "A petitioner cannot omit items from his schedules, force the trustee and the creditors, at their peril, to guess that he has done so--and hold them to a mythical requirement that they search through a paperwork jungle in the hope of finding

an overlooked needle in a documentary haystack." Id. at 1206 *citing* In re Tully, 818 F.2d

106, 108 (1st Cir. 1987).

58. Plaintiff charges Defendant with embezzling its diamonds or proceeds thereof in 2003 or 4

and then secreting them away or living off of them for 8 years. A critical inquiry under this

subsection is the requirement of the loss of assets be "not too remote from the bankruptcy

petition date." Defendant's activities from 2004 through 2011 were not explained in detail,

but the evidence showed that Defendant invested in various real estate ventures that all

failed, that he opened a pawn shop, and that he was sometimes unemployed.  It does not

follow from the evidence, however, that the assets were present within the two or more years

before the bankruptcy.  Although the interests in the Moorpark, Addison, and Coronet

properties were present, there was no indication there was any equity.

59. Plaintiff has failed to prove that Defendant should be denied his discharge pursuant to 11

U.S.C. §727(a)(5) because Defendant satisfactorily explained the loss of his assets through a

short sale, foreclosure, general loss of business as well as the conversion of assets of the

Corporation by third parties.

//

//

//

//

**Damages/Judgment**

60. The amount that is not discharged as owing to Plaintiff for the §§ 523(a)(4) and (a)(6) claims

is $1,784,270.75, as explained in the loss calculation above.

Judgment will be entered for Plaintiff for 11 U.S.C. §§ 523(a)(4) and (a)(6) and judgment

for Defendant as to 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B) and §§ 727(a)(2)(A), (a)(3), (a)(4)(c),

and (a)(5).

The continued hearing on November 15, 2017 is vacated.

###

Date: November 9, 2017

Maureen A. Tighe
United States Bankruptcy Judge